March 5, 2008



VIA Hand Delivery

The Honorable Colleen McMahon
United States District
United States District Court Southern District of New York
500 Pearl Street
New York, New York 10013

Re: <u>United States v. Michelle Gluck</u>
<u>Docket #07-CR-49</u><s>2</s>-01 (CM)
                493

Dear Judge McMahon:

    I write Your Honor in support of my request that you impose a non-custodial sentence of home detention with community service on Michelle Gluck when she appears before you on March 12, 2008. I respectfully suggest that there are compelling factors suggesting that a prison sentence is not only unwarranted in this matter, but in fact will inure to the extreme detriment and devastation of the Gluck family and the community at large. Further, there are compelling legal reasons why a custodial sentence should not be imposed.

    Your Honor has had the benefit of a Pre-Sentence Report, (PSR), as well as the highly detailed report prepared by the Consulting Project. In addition, attached to this submission is a letter to the court from Michelle Gluck. Given the extraordinary detail presented in these two reports and Ms. Gluck's letter, I will endeavor not to repeat a great deal of information regarding Ms. Gluck's upbringing and background.

    When writing sentencing submissions, a criminal defense attorneys' first goal is to somehow distinguish their client from so many other defendants with similar if not identical family and educational backgrounds who have committed similar if not identical offenses. As you have no doubt realized from reading thousands of such letters from our colleagues from the defense bar, often times we run out of groundbreaking arguments and our letters can become repetitive and often times appear mechanical.

    Representing Michelle Gluck has been a unique experience. My practice for the past 23 years has been limited to criminal work either as a state court prosecutor or as a defense attorney for the past 18 years. There have always been moments during my

1

representation of criminal defendants when the client will begin to see themselves as some sort of victim or point to highly publicized cases where defendants have appeared to receive limited punishment and ask why am I being treated so harshly compared to others. That has never happened with Michelle Gluck. Rather, at every meeting we have ever had, Ms. Gluck has apologized to me and thanked me for all of my efforts. Although I know that she is very frightened, she has only expressed concerns about the effect of her misconduct on the people she loves most; her husband, her three children, her parents and her in-laws. She is frightened about the punishment she faces, but her main concern is how it will affect her family.

When I suggested to her that it might be helpful to have her parents, in-laws, friends and clergy from her community write letters of support, her initial response was to say no that she didn't deserve them and she didn't want to put anyone out. Reluctantly, she agreed to ask some people for letters but only on the condition that she not tell them of her conduct. I explained to her that the value of the letters would be greatly diminished but she was too ashamed to tell people about what she had done. I continued to suggest that we provide some letters to the Court in the hope that they would at least give the Court a glimpse of how people feel about Michelle and the work she does in her community. Those letters are contained in the report from the Consulting Project with the proviso by the Consulting Project that except for her husband, the authors of the letters were unaware of Ms. Gluck's pending criminal case. (There is one letter from a friend, Christine Olownia that seems to reflect knowledge of Michelle's situation. However, Ms Olownia is not aware that Michelle has admitted to taking money from her company. She is under the impression that Michelle is in trouble for not being truthful about the activities that were occurring at LS, Inc.) As a devout Catholic, Michelle did confess her sins to Father Andrew of St. Andrew Avellino Church in confession. However, she has not asked him to write on her behalf. Ms. Gluck's reluctance to confide in friends and family or to ask ANYONE for help except her husband distinguishes her from every person I have ever represented.

According to the United States Sentencing Guidelines, Michelle Gluck faces an advisory Guidelines range of 27-33 months imprisonment. Although the plea agreement prohibits me from seeking any form of a downward departure, both the Government and the defense are permitted to seek a sentence outside of the Stipulated Guideline Range in accord with the factors enumerated in Title 18, United States Code, Section 3553(a). As I set forth in detail below, I suggest that there are ample reasons to impose a non-custodial, home detention sentence on Michelle Gluck.

## Analysis of Section 3553(a) Factors

Section 3553(a) of Title 18, United States Code requires the sentencing court to consider seven factors in the sentencing process. A Court should consider the factors in Section 3553(a) to impose a sentence "sufficient but not greater than necessary" as required in accordance with the Supreme Court's decision in United States v. Booker, 125 S.Ct. 738 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2nd Circ. 2005). In particular, section 3553(a)(1) asks that the sentence imposed consider both the nature and circumstance of the offense and the history and characteristics of the defendant, while section 3553(a)(2)(A) requires that the penalty provide just punishment for the offense that simultaneously affords adequate deterrence to criminal conduct as required by 3553(a)(2)(B). United States v. Arreaga, 2006 WL 278156 (S.D.N.Y. 2006).

*The nature and circumstances of the offense and the characteristics of the defendant. 18 USCS 3553(a)(1).*

Michelle Gluck was first employed at L.S., Inc. in February 1985. From 1985 until 1998, she was a model employee, working her way through various positions in the company and earning modest salary increases. As set forth in the PSR, Michelle and her husband purchased their only home in 1993 for $175,000. The probation officer describes the home as modestly furnished with one and a half bathrooms.

The offense conduct did not begin until July 1998, thirteen years after she started working for LS Inc. It lasted until December 2004, a period of 77 months. As detailed in Michelle's letter to the Court, the offense conduct occurred in an atmosphere where the President of the company, Williams Cavanagh, and her direct supervisor, Tyrone Thompson, were actively engaged in stealing millions of dollars from the company. Although Cavanagh stole approximately 2.8 million dollars, Thompson's loss amount was approximately half of Ms. Glucks'. For William Cavanagh, using company funds and credit cards to pay for extravagant personal expenses was the rule and not the exception.

Unlike William Cavanagh, she did not use the money to live a flamboyant or luxurious lifestyle, although candidly, it was irrelevant to the victim, L.S. Inc, how their money was used. However, in exploring the nature of the offense, I believe it is relevant to contrast the fact that William Cavanagh used the money he stole to pay for yachts, an expensive home and an assortment to luxury items. Whereas Michelle Gluck used the money to stay out of debt, make modest home repairs and generally make ends meet in a middle class lifestyle. Admittedly, she did go on family vacations; to a dude ranch in upstate New York and to Disney World on two occasions. However, my explanation for how Michelle Gluck utilized the money is not meant to condone or justify her wrongdoing.

3

As for the personal characteristics of Michelle Gluck, the voluminous submissions to date make it clear that Michelle has been a generous, productive, and positive member of her community her whole life. As a youngster, her parents instilled in her the value of hard work, thrift and community obligations. As an example, although her mother was a nurse in Germany prior to immigrating to the United States, she took a job as a cook at McDonald's to help bring in money for her family. Although many youngsters might have rejected such work, in 1981 Michelle was thrilled to join her mother at McDonald's and worked her way up from a cashier and cook to a manager. Michelle worked at McDonald's for 6 years.

After graduating from Saint Agnes High School in College Point Queens, Michelle was admitted to Columbia University. Unfortunately, the partial scholarship she was offered did not nearly cover enough of the costs of an Ivy League education to allow her to attend. Instead, she attended Baruch College. At Baruch, where she felt out of place and was very unhappy, she made the decision to leave school. Her parents made it clear to her that if she wasn't attending school, she had to get a job to help contribute to the family expenses. In February of 1985, Michelle began working at LS, Inc. Notably, during the first thirteen years of her employment, she was an excellent employee and was given greater responsibilities year after year. It wasn't until William Cavanaugh became President and the culture of corruption set in that Michelle, who throughout her whole life was in every respect a model citizen, began to engage in a course of conduct that can only be described as aberrational. Ultimately, Ms. Gluck worked at LS, Inc until she was terminated in August 2005 as a result of her misconduct.

Most significantly, a term of imprisonment would have a devastating effect on the Gluck family, particularly her three young sons, ages 6, 10 and 13. She is and has been for years a very active member of her church and children's schools. She has the responsibility of assisting in the care of her husband who suffers from diabetes and high cholesterol, and also helps provide care for her elderly parents and in-laws.

Although her own parents and in-laws were previously able to help Michelle and her husband with childcare, they are now aging and coping with their own health problems, and are unable to take care of Michelle's children. Bill Gluck has a steady job but continues to work late hours. The idea of hiring a childcare provider is just not a financial possibility for Michelle's family. Michelle is now working to help support her family as well as pay back her restitution. She has modified her work schedule so that she is able to pick up her children from school and bring them to their sports and after school activities. As detailed in the attached letter from Michelle Gluck, she is a vital part of her young boy's lives. Moreover, without Michelle's salary, the effects on her family's life would be devastating; her children would likely have to leave their parochial schools, as they would not be able to afford these schools on one income. As detailed in her letter to the Court and in letters from members of the community, she is an extraordinary mother who is an active presence on a daily basis in her sons' lives.

*The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. 18 USCS 3553(a)(2)(A).*

The Court may fashion any number of sentences short of prison that will adequately address these issues. Given the humble and productive life that Michelle has led, I submit that a sentence of home confinement with extensive community service obligations will certainly promote respect for the law to anyone who knows that Michelle has lived an unblemished and in fact laudable life prior to her succumbing to the temptations she was exposed to at her work. She has always balanced her devotion to her family's needs while maintaining full-time employment. She returned to work promptly after the births of her three children and in fact created a schedule that allowed her to complete all of her work responsibilities and also work from home part time when her children were infants.

Michelle does not dispute the seriousness of her crime. She knows what she has done is morally wrong and that it is a serious crime.

A just punishment for the offense however must take into account the punishment for Bill Cavanaugh who received a sentence outside of the Guidelines of 18 months despite a guideline range of 51-63 months. A sentence of home confinement would allow Michelle to continue to reflect on her wrongdoing, while performing community service and working to pay back the remaining restitution.

[handwritten margin note: who did that?]

*The need for the sentence imposed to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant. 18 USCS 3553(a)(2)(B),(a)(2)(C).*

No one can really predict what is necessary to provide adequate personal deterrence, but given Michelle Gluck's prior history and the profound and abject shame that she acknowledges for her conduct, I submit that it is unimaginable that she would ever engage in any further type of criminal conduct.

*To provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner. 18 USCS 3553(a)(2)(D).*

Ms. Gluck doesn't need educational or vocational training so much as he needs continued psychological treatment.

*The kinds of sentences available under 18 U.S.C.S. 3553(a)(4).*

Because the Guidelines are now advisory, the Court, after considering them, has a wide range of options in tailoring an appropriate sentence for a defendant.

*The court, in determining the particular sentence to be imposed, shall consider the need to avoid **unwarranted** sentence disparities among defendants with similar records who have been guilty of similar conduct. 18 USCS 3553a (6).*

This is an extraordinarily compelling reason for this Court to consider a sentence outside the advisory Stipulated Guideline Range. Without question, the most culpable person in this case was William Cavanagh. It is undisputed that this insidious environment at the company began when Cavanagh became President. He set in motion a poisonous atmosphere and he began to steal over 2.8 million dollars in funds in a dramatic fashion. It is also undisputed that the money was used to finance his lifestyle of opulence and decadence. At the time of his sentencing, Bill Cavanaugh's stipulated Guideline Range was 51-63 months. He was given a non-guideline sentence of 18 months. As a result, the most culpable person at LS, Inc was sentenced to term of imprisonment of 18 months. I submit that fairness and mercy would require a punishment for Michelle that is proportional and that a sentence of home confinement and extensive community service would be appropriate in light of the sentence given to the most culpable offender.

\* ***A copy of the sentencing transcript is available if the Court would like to review the proceedings.***

*The need to provide restitution to any victim of the offense.* 18 USCS 3553(a)(7).

Initially it should be noted that Ms. Gluck has previously paid back $125,000.00 towards her restitution obligation. A sentence of home confinement would not only enable her family to be spared emotional and financial ruin but would also enable Michelle and her family to further liquidate whatever they could and also use her income towards additional restitution, particularly if she was allowed to be employed.

### Conclusion

In a recent column, Anna Quindlen discussed the concept of contrition as a sign of leadership. Too often we hear people apologize in ways that obfuscate their misdeeds and merely are just asking people to forgive and forget. According to Ms. Quindlen, sociologists suggest that a true apology has four parts: "admitting fault, showing remorse, acknowledging damage and indicating how it will be repaired." (Newsweek, Jan. 8, 2007). Michelle Gluck has not merely uttered the words I am sorry or I accept responsibility for

my actions. I have never met anyone who is as deeply ashamed of criminal conduct as Michelle Gluck. She has never spoken to me about Cavanaghs' sentence or tried to compare her circumstances to anyone else. She has never blamed anyone but herself for her circumstances and has said to me on many occasions "I was brought up to know better." She has accepted without pause or question the loss amount although she never realized that over the years it had grown to such a large amount. She has already paid back approximately 25% of that amount and has vowed to repay every last penny. Given her unblemished prior record, laudable, productive and modest lifestyle and her extraordinary responsibilities for her three young boys as well as her responsibilities in caring for her parents and in-laws, I submit that a sentence of home detention and community service would be both just and merciful, and is the most appropriate sentence for Michelle Gluck.

Very truly yours,

Alan M. Abramson (AA0639)

cc: Danya Perry, A.U.S.A.
     Sandra Campbell, U.S.P.O

March 6, 2008

Dear Honorable Judge McMahon,

    Since my arrest, it has been a painful period of reflection facing what I have done. My name is Michelle Gluck. I was born Michelle Andrzejewski on April 3rd, 1964 to Adelheid and Bernhard Andrzejewski, German immigrants who met here in New York and married. My parents left large families to come to America, studied English and both worked very hard to buy their own home. In 1965 we moved into the home I grew up in and where my parents still live today. I have one brother Stephan, who is 16 months younger than I. My father was a master craftsman cabinetmaker. My mother was a pediatric nurse in Germany, but due to the initial language barrier, she never pursued her nursing degree here.

    Growing up, I attended Catholic grammar school and an all girls Catholic High School. My mother was home with my brother and I until I was in 7th grade. At that time, she got a part-time job as a cook at the local McDonald's that was just opening. She worked the early morning shift and was usually home shortly after we came home from school. I got a paper route when I was 11 so that I could save money to buy myself some new clothes for high school.

    When I was 15, I applied for a job at the McDonald's my mother worked at. I worked after school and weekends as a cashier and a cook. Eventually I was promoted to manager. I learned about business, responsibility and accountability. I made many wonderful friends, friendships I still have today. My parents expected me to put half my earnings in savings, a third toward the house expenses and the rest for my spending money. I was not always happy about that, but my parents wanted me to learn what life was about and to learn to take care of myself. I appreciate it all now that I am an adult.

    I met a wonderful young man named William Gluck at McDonald's when I was 17. We were great friends. We grew up together and were lucky to both come from wonderful families. Bill's family made me feel welcome and included me in everything.

    I worked very hard at school and graduated with honors. I received scholarship money from Columbia University, but the tuition was too expensive and the scholarship money was not enough to cover the total cost. I decided to attend Baruch College, a CUNY school to study accounting. Unfortunately, I was not happy there. I did not have any friends who were attending Baruch, and I felt very alone. Eventually I stopped going to school. This devastated my parents as well as Bill's parents. They all encouraged me to try again, but I was lost. My parents informed me of the harsh reality that if I did not intend to return to school I would need to get a full time job. I went to an employment agency and my first interview was at LS, Inc for an Administrative Assistant position. LS Inc. was a litigation support company for attorneys engaged in tobacco litigation. I did

1

not get the job as an Administrative Assistant but they offered me a clerical position instead. I began working at LS, Inc on February 1st, 1985.

It did not take long for me to realize that this is not what I wanted to do for the rest of my life. I returned to school attending Queensborough in the evenings while working at LS during the day. I was eventually promoted to administrative assistant. When the bookkeeper was let go, William Cavanagh, the vice president at the time, knew I was studying accounting and offered me the position. I was so excited for the opportunity.

Tyrone Thompson was the accountant and we hit it off immediately. He was kind and very generous about teaching me all about how to maintain an accounting department. With my education I was able to apply what I had learned. My main responsibilities included vouchering and entering invoices, paying bills, preparing checks for signature and maintaining the files. Tyrone and I worked together to implement a new accounting computer system to make the department run more efficiently. It was a very exciting time for me. I was doing something I wanted to do. I was working for a wonderful man, someone who was like a second father to me.

Bill Gluck finally asked me to marry him after dating for 10 years. We were married on July 26, 1991. My name would finally fit on applications! We found an apartment close to both our families. I took on the role of taking care of all our financial responsibilities, including paying all bills and doing all banking. Bill was working very hard at JP Morgan Chase and was attending school in the evening at St. John's University for his Masters in Finance.

When Dr. Giller, the President of LS, Inc left the company, Bill Cavanagh was promoted to President. We were excited at the time because Bill's management style was much more easy going yet was able to get everyone to work hard. He streamlined the way things were done in the office, making things run more efficiently. He was able to get the best out of everyone. He was charismatic, a marine, and a leader. It was an exciting time for me professionally as well as personally, as I was having my first child. Matthew was born on November 12th, 1993. We had just purchased our first home and moved in late August. It was a semi-attached small three bedroom fixer upper. My father helped us transform our old house into our home.

I returned to work three months after delivering Matthew. My parents watched him while I was working full-time. This was a big financial relief as we had just purchased our home and had many expenses as most young families do. Our second son, William, was born on May 14th, 1996. I did not want to burden my parents with two children, so we interviewed and found a wonderful woman to watch our two sons. When I returned to work, I was working only three days in the office and Bill Cavanagh and Tyrone Thompson allowed me to work the other two days from home. They were very kind to me. I was very grateful.

2

Bill had promoted Tyrone to Controller and I was given the title of Accountant. My responsibilities did not change very much but Tyrone allowed me to prepare the monthly journal entries and prepare payroll under his supervision. He wanted me to learn all aspects of accounting. He was very generous, sharing his knowledge and experience. His hope was that when he would finally retire, I would be able to step in his shoes.

I am not really sure when it all started, but Bill began having Tyrone and I write checks for him that did not have backup. He initially told us that he will get the invoices to us shortly or make up his own check requests and sign off on them. It was not often and he was the President of the company. It eventually became more regular. He also acquired credit cards, both American Express and VISA, for all the managers and himself. It eased with purchasing certain items where companies preferred credit cards versus waiting for a check for payment. I was also given cards, but never used them.

Bill began using the credit cards for what seemed to be personal use. When Tyrone questioned him about the charges, he told Tyrone and I that this was another form of compensation for him from the board of directors and that he had liberal use of the credit cards. He was angered that we would question him. Of course, because we had a long and close relationship, we wanted to believe what he was saying was true. He was the President, and our friend. Each year the company was audited by an outside CPA firm. If any items that were questionable were asked about by the auditors, we referred the auditors to Bill for explanation. Whatever he told them must have satisfied them because the audited financials were printed and sent to the board of directors and no questions were ever asked. It seemed to be acceptable to the board and I wanted it to be true.

Tyrone was having dental issues and it was recommended that he have his teeth replaced with dental implants. Ty spoke with Bill and asked that the company help him pay for the implants, as they were not covered by insurance. Bill allowed Ty to use the company checks to pay for the procedure.

I had a great job. I was able to work three days a week in the office and the rest from home. I was earning a salary and great benefits. Tyrone and Bill were always kind and supportive. However, being in this environment became difficult and confusing. It became an acceptable practice for Bill and Ty to use the company credit cards and checks for personal use.

Like any young family, making ends meet was always difficult. We had so many expenses and always seemed to be struggling. My husband was diagnosed with Type 2 diabetes shortly before we were married. His diabetes requires continuous monitoring throughout the day. In 1999, my husband's doctor had recommended that he acquire a pump to directly infuse insulin into his system. The pump would not only make my husband's quality of life better, it would improve his health. I spoke with Tyrone about it and he said I should do whatever it takes. "You have an opportunity here at LS, Inc and you would be a fool not to take advantage." We had no savings to speak of and I wanted this for my husband. I made the decision to write a check from LS, Inc. to myself to

3

cover the cost of the pump. I signed Bill and Tyrone's name. I thought that if it was discovered, I did not want them to be held responsible for what I had done.

Although I knew what I had done was wrong, I put it in the back of my mind. Being in this environment where this behavior was accepted by people who I looked to for guidance and trust, I deluded myself into believing it was OK. Over the next several years, I allowed myself to take advantage of the situation. I was in denial about what I was doing.

On September 3rd, 2000, my husband and I were blessed with our third son Christopher. When returning to work I continued on the same schedule of three days in the office and two days from home. Bill Cavanaugh was out of control when I returned. He was excessively using the company credit cards and checkbook. He began paying the credit cards by transferring funds directly from the LS, Inc. bank account. However, I also continued to write myself checks as needed. It became a dependency. Bill had hired a new CPA to do the annual audit and prepare the financials. This CPA did not perform an in-depth audit as previously had been done.

Bill Cavanagh had informed Tyron Thompson and I that he was going to be let go in December of 2004. Once gone, Bill Cavanaugh continued to pay the credit cards automatically from LS, Inc's account. Ty had to inform Owen, now president, what Bill was doing. Owen apparently informed the Board of Directors. Our offices were closed on Martin Luther King Day in January of 2005. When Ty and I returned to work on that Tuesday, all our files, ledgers and banking records were gone.

I was so frightened. Owen told us that the files were taken because of the upcoming unemployment audit, but Ty and I knew better. About three weeks later, Tyrone called me at home to tell me that Owen had called him into the conference room where he was questioned by two men regarding some cancelled checks that were written for Bill or by Bill. They informed him that he would have to meet with a lawyer and investigators to answer questions the following Monday. Ty had retained an attorney in anticipation of what might transpire. He spoke with his attorney and was advised to have counsel present at the meeting. Ty's lawyer spoke with LS, Inc's attorney informing them that he would like to attend the meeting with Ty. LS, Inc's attorney told him that he would not be allowed to attend and that if Ty chose not to meet with them, he could consider himself fired. Ty did not attend the meeting and was let go. I was devastated. I felt my world crumbling around me.

Owen came to me the following morning and told me that Ty would no longer be with the company and could I handle the department by myself. I told him that I would do my best. The next day he asked me to come into Tyrone's office and introduced me to two men, a lawyer and a forensic accountant who questioned me for hours. I felt so alone, frightened, ashamed. I had a relationship with these men for over fifteen years.

4

When the Board decided to pursue Bill criminally all my fears returned. Owen told me I would be questioned by a new legal team. I spent the day being questioned again about Bill and Tyrone. I was told that on the following Tuesday I would meet with two postal inspectors and a federal attorney to answer similar questions. I went to my office and cried. I felt I had betrayed my coworkers, betrayed my family, betrayed LS, Inc. I did not have the courage to face the truth.

When I spoke to my friend who was a district attorney in Queens regarding the meeting with the postal inspectors, she strongly encouraged me to have an attorney present with me. I had not told her what I had done, just that I was frightened to speak with these men. She spoke to a colleague who recommended Alan Abramson to me. He was wonderful. I explained the situation, omitting what I had done. He contacted the LS, Inc attorney to tell him that he would be accompanying me to the meeting and would be rescheduling the meeting.

The next week at work, Owen suddenly became distant, only speaking to me when he had to. I then went on my scheduled week of vacation, but came in that Friday to transmit payroll because no one in the office knew how to do payroll. When I returned to work on Monday, August 28th, 2005 I was told my services were no longer needed.

Several months later, I met with the Postal Inspectors. Although I answered all of their questions, I was not candid about my own sinful behavior.

Months later I was subpoenaed by LS, Inc. to report to their law offices on the pretense that they needed to speak to me regarding a civil suit they had filed against Ty. Mr. Abramson referred me to a civil attorney. When my husband came home from work and the kids were in bed I sat Bill down and explained all I had done. My shame, guilt and despair were overwhelming. Initially he was totally shocked. "No, you would never. This is just impossible! This is not you." After the initial shock, he was nothing but supportive.

I had been in denial for so long and suppressed the truth from myself. How could the number be so large? What have I done? I had to make amends, but the reality is that I didn't have anywhere near that amount of money. I spoke with my attorney and told him I would do whatever I could to repay the debt I told my husband I was going to give LS my 401K and my pension. Eventually, I returned $125,000, my entire 401K, as an initial down payment on the total that I had taken from LS Inc.

The morning I was arrested I was completely shocked. It has been a very painful period of reflection. Firstly to try to understand why I did what I did. I was in an environment that corrupted who I am. I was strongly influenced by my mentors. My moral convictions became clouded. However that is no excuse. I am an educated person, with a very moral upbringing. I wish I could reset the clock and find the strength within myself to not make the same poor, sinful decisions

5

The amount of money that I was told I took seemed impossible to me. I looked back at our bank statements to see where all that money went. Over a period of six and a half years, I used the money to pay off all our credit card debt and remain debt free. It helped pay for our monthly expenses. When repairs needed to be done in our home, I did not have to struggle with where the money was going to come from. Our shower pan had rotted in our only full bathroom causing water damage in the kitchen below. We were forced to gut the bathroom and replace some of the plumbing. We updated the bathroom. We fixed the damage in the kitchen.

The money allowed me to pay off our Toyota Sienna minivan. It allowed me to order takeout much more often and for us to eat out with our family more often. We were able to go on family vacations with my parents, Bill's parents, our brother's and their families to a family resort upstate called Sunny Hill. We were also able to go on two vacations to Disneyland in Florida. The money went to paying for general household repairs and replacements of old appliances. The money became a dependency.

The word sorry seems so shallow in light of what I have done, but it is what I truly am. The money was originally taken to make my family's life better, but I have harmed my family more than I could have ever imagined. I cannot begin to express the shame and remorse I feel for what I have done to my family and to LS, Inc.

If I could only change the decisions I have made, but the reality is I can not. I can only try to make amends and accept punishment for what I have done. I will return all the funds I have taken. I realize that this will take time, but I will. I will respectfully accept whatever punishment you bestow, but I ask that you might consider not me, but my husband, my children and family. My husband is a hard working, wonderful father. Even in the best of circumstances, it is so difficult to raise a family by yourself. Our youngest son Christopher is so attached to me. My husband and I have never been apart from them since their births. Billy is always suffering from typical middle child syndrome and requires a great deal of special one on one attention. Matthew is a typical teenager who now more than ever needs to be guided by both his parents.

Financially, my husband has to work and my parents and my in-laws are no longer able to help us with child care as they have in the past due to their health. My salary is essential in our maintaining our home and everyday expenses.

Finally, I am unable to sleep thinking of how my family will get through all of this due to my sinful decisions. We are in a close knit community and the shame and gossip they will have to endure will be unbearable. The consequences of my actions are so far reaching. I am concerned for their mental and emotional well being. We have spent so much effort into making our children caring, good human beings. I am also concerned for my husband's health both emotional and physical. He has been so loving and supportive, but this is eating away at him as well.

I am humbly requesting that you consider home incarceration as a punishment. It would allow me to continue working and repay the debt I owe. It would prevent the

6

extraordinary emotional and financial ruin of my family. It would allow me to remain with my family and spare them the many consequences of my actions. They do not deserve to be punished for what I have done. They are the innocents in all of this.

      I am so remorseful for the crime I have committed against LS, Inc. I will respectfully accept your decision and although I have no right to ask, I hope that you will consider my plea.

Respectfully,


Michelle Gluck